UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
LUCIANO MORALES,                                      :

                 Plaintiff,          :          13cv06844 (LGS) (DF)

      vs.                                              :          **REPORT AND**
                                          **RECOMMENDATION**
                                   :

CAROLYN W. COLVIN
Acting Commissioner of Social Security,               :

                Defendant.          :
------------------------------------------------------------X

**TO THE HONORABLE LORNA G. SCHOFIELD, U.S.D.J.**

     Plaintiff Luciano Morales ("Plaintiff") seeks review of the final decision of the Acting

Commissioner of Social Security ("Defendant" or the "Commissioner"), denying Plaintiff

Supplemental Security Disability benefits ("SSD") under the Social Security Act (the "Act") on

the ground that Plaintiff's impairments did not constitute a disability for the purposes of the Act.

Plaintiff has moved, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, for judgment

on the pleadings reversing the decision of the Commissioner.  (Dkt. 15.)  Defendant has cross-

moved for judgment on the pleadings affirming that decision.  (Dkt. 19.)

     For the reasons set forth below, I respectfully recommend (a) that Plaintiff's motion be

granted, to the extent that Plaintiff requests that his claim be remanded for further consideration

of his mental impairments, and (b) that Defendant's cross-motion be denied.

## BACKGROUND

**A.**   **Medical Evidence**

Plaintiff applied for disability insurance benefits on August 3, 2010 (*see* R. 126-34[1]),

claiming a disability onset sate of March 1, 2009 (*id*. at 128, 147).  Plaintiff asserted that he was

disabled due to throat cancer (stage unknown), diabetes, neuropathy, high blood pressure, high

cholesterol, depression, anxiety, insomnia, lower back pain, and arthritis in the right shoulder and

arm.  (*Id*. at 151.)  Despite this array of claimed conditions, though, Plaintiff's current challenges

to the denial of his benefits claim are based solely on his alleged mental impairments, and thus

this Court's summary of the evidence will focus primarily on those portions of the voluminous

Record that relate to Plaintiff's mental health.

### 1.   **Montefiore Medical Center**

Although, as described below, Plaintiff made visits and/or was admitted to a number of

hospitals in 2010 and 2011, including Lincoln Medical and Mental Health Center, Metropolitan

Hospital, Bronx Lebanon Hospital, and Bellevue Hospital, generally following suicide attempts

(*see infra* at Background Section A(2)), the healthcare professionals with whom Plaintiff appears

to have had the closest treatment relationships, during that same period of time, were affiliated

with Montefiore Medical Center ("Montefiore").  These professionals included internist[2]

Dr. Bonni Stahl and psychiatrist Dr. Anthony Stern, as well as social worker Jose Rodriguez

("Rodriguez").  Plaintiff's visits with these three individuals at Montefiore overlapped, as, for the

---

[1] The background facts set forth herein are taken from the administrative record (referred to herein as "R."), which includes, *inter alia,* Plaintiff's medical records and the transcript of the October 19, 2011 hearing held before Administrative Law Judge ("ALJ") Kenneth Scheer, at which Plaintiff testified.

[2] Dr. Stahl's specialty appears to be internal medicine.  (*See* R. at 222.)

most part, he was seeing each of them during the same timeframe.  For ease of reference, however, this Court will summarize their records separately – given that one of Plaintiff's arguments before this Court relates to the issue of whether the ALJ assigned the appropriate weight to the opinions of Plaintiff's individual treating sources, particularly the opinion of his treating psychiatrist, Dr. Stern.

### a.   Evaluation and Treatment by Internist (Dr. Stahl)

### i.   Initial Appointment Records
### (November 2009 - September 2010)

Plaintiff saw Dr. Stahl on November 30, 2009.  (*Id*. at 266-71.)  Plaintiff reported a history of hypertension, diabetes, and foot pain, and disclosed multiple suicide attempts.  (*Id*. at 266.)  Dr. Stahl noted a history of "heavy use" of alcohol, as well as use of marijuana and cocaine.  (*Id*. at 269.)  Plaintiff told Dr. Stahl that, at that time, he was only drinking a six-pack of beer on weekends.  (*Id*.)  Dr. Stahl diagnosed Plaintiff with diabetes mellitus and alcohol abuse/depression, prescribed him Metformin[3] for his diabetes, and noted that Plaintiff might benefit from medication and counseling for his alcohol abuse and depression.  (*Id.* at 271.)

On December 16, 2009, Plaintiff arrived at the clinic to see Dr. Stahl again, but left before his appointment. (*Id*. at 264.)  He spoke to Dr. Stahl over the phone that evening and told her that he felt very depressed and had been "feeling suicidal since [his] last visit."  (*Id*.)  He also told Dr. Stahl that he had "[taken] a half bottle of ibuprofen [two] weeks [prior]."  (*Id*.)  He denied any current feelings of suicidality and agreed to meet with a counselor during his next appointment.  (*Id*. at 265.)

---

[3] Metformin is a medication used to treat Type 2 diabetes.  *See* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a696005.html (last accessed Feb. 2, 2015).

On December 23, 2009, Plaintiff had another appointment with Dr. Stahl, as well as an appointment with a social worker at Montefiore.  (*Id*. at 262-63; *see also id*. at 369, and *infra* at Background Section A(1)(b).)  Plaintiff related, to Dr. Stahl, the details of a recent suicide attempt, and the doctor noted that Plaintiff had a restricted affect.[4]  (*Id*. at 262.)  In addition to depression, Dr. Stahl diagnosed Plaintiff with poorly controlled diabetes and referred Plaintiff to a specialist to evaluate a possibly cancerous "nodule" on his vocal cord.  (*Id.* at 263.)

Plaintiff saw Dr. Stahl again on March 3, 2010 (*id*. at 260), as part of a preoperative evaluation for surgery to remove a vocal cord lesion (*id*. at 206).  During the evaluation, Plaintiff complained of an increase in right arm pain in the previous three months, after returning to construction work.  (*Id*. at 260.)  Emotionally, Plaintiff reported moving out of his girlfriend's apartment and said that he felt "great."  (*Id*. at 261.)  Dr. Stahl noted that Plaintiff continued to see a counselor, and that, at the time, he was stable, without any suicidal ideation.  (*Id*.)  She diagnosed Plaintiff with diabetes, depression, biceps tendinitis, and hyperlipidemia.[5]  (*Id*.)

On September 8, 2010, Plaintiff saw Dr. Stahl and complained of severe foot pain, tingling in both hands, and shoulder pain.  (*Id*. at 258-59.)  He reported multiple suicidal episodes two months earlier, but reported that he was "stable" at the time of the appointment. (*Id*. at 258.)  A monofilament test[6] from that date showed significant loss of sensation in

---

[4] A "restricted affect" means "[h]aving a far narrower range of emotional expression than would be expected; muted emotional activity." *See* http://psychcentral.com/encyclopedia/2008/restricted-affect/ (last accessed Feb. 2, 2015).

[5] Hyperlipidemia means high blood cholesterol levels.  *See* http://www.nlm.nih.gov/medlineplus/ency/article/000403.htm (last accessed Feb. 2, 2015).

[6] A monofilament test uses a soft nylon fiber to measure sensitivity to touch.  If a patient is unable to feel the filament, it is a sign that he or she has lost sensation in those nerves.  *See* http://www.mayoclinic.org/diseases-conditions/diabetic-neuropathy/basics/tests-diagnosis/con-20033336 (last accessed Feb. 2, 2015).

Plaintiff's lower extremities.  (*Id*. at 241.)  He was subsequently prescribed Gabapentin.[7]  (*Id*.)

An examination of his shoulder indicated supraspinatus[8] weakness, and Dr. Stahl diagnosed a

likely rotator cuff injury.  (*Id.* at 258-59.)

### ii.    Medical Report for Determination of Disability (September 27, 2010)

On September 27, 2010 Dr. Stahl provided a medical report and functional assessment

for a determination of disability.  (*See generally id*. at 221-46.)  She listed Plaintiff's diagnoses

as diabetes mellitus, hypertension, hyperlipidemia, laryngeal carcinoma, depressive disorder,

severe peripheral neuropathy,[9] and dysarthria[10] secondary to surgery.  (*Id.* at 221.)  As to

Plaintiff's exertional functional capacity, Dr. Stahl opined that Plaintiff could do light work, as

he could lift 20 pounds occasionally and 10 pounds frequently, stand and walk for six hours a

day, and push and pull with arm or leg controls.  (*Id*. at 222.)  As to nonexertional limitations,

Dr. Stahl noted that, given his prolonged history of depression and multiple suicide attempts,

Plaintiff was "abnormal" in his ability to respond to coworkers and supervisors.  (*Id*.)  Given

Plaintiff's medical conditions, his need to make frequent doctor's appointments, and his

---

[7] Gabapentin is a medication that is often prescribed to people with epilepsy to help control seizures, but is also used to relieve tingling due to nerve damage in people who suffer from diabetic neuropathy.  *See* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html (last accessed Feb. 2, 2015).

[8] The supraspinatus is a shoulder muscle.  *See* http://www.rad.washington.edu/academics/academic-sections/msk/muscle-atlas/upper-body/supraspinatus (last accessed Feb. 2, 2015).

[9] Peripheral Neuropathy is the weakness, numbness, and pain that accompanies nerve damage.  One common cause is diabetes.  *See* http://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/basics/definition/con-20019948 (last accessed Feb. 2, 2015).

[10] Dysarthria is a motor speech disorder that results from impaired movement of the muscles used for speech production.  *See* http://www.asha.org/public/speech/disorders/dysarthria/ (last accessed Feb. 2, 2015).

"significant peripheral neuropathy," Dr. Stahl opined that Plaintiff was also "abnormal" in his ability to maintain adequate work attendance; grasp, release, handle, and finger objects; tolerate dust, fumes, and extremes of temperature; and tolerate exposure to heights or heavy machinery. (*Id.*)  She also found that Plaintiff had speaking limitations due to dysarthria.  (*Id.*)  Dr. Stahl opined that Plaintiff did not have any limitations as to stooping, bending, crouching, squatting, or climbing; that he could operate a motor vehicle; and that he could understand, carry out, and remember simple instructions.  (*Id.*)  Regarding his shoulder injury, Plaintiff showed full range of motion, with "pain on lifting or extreme range of motion," but Dr. Stahl stated that she expected restored functional use within six months.  (*Id.* at 223.)

In assessing Plaintiff's psychiatric health, Dr. Stahl noted that Plaintiff had depressive disorder and had been hospitalized three or four times due to suicide attempts.  (*Id.* at 242.)  She described Plaintiff's most recent mental status exam, conducted in April 2010 (*see infra* at Background Section A(1)(c)(i)), as showing mood lability and angry mood and affect, but also coherent thought organization with no active suicidal ideation or delusions.  (*Id.* at 242.)  She also noted that Plaintiff had impaired insight and judgment, based on his suicide attempts and cutting behavior.  (*Id.* at 243.)  Dr. Stahl concluded that Plaintiff was "functional" as to activities of daily living, but that he suffered from "impaired" social functioning "secondary to mood lability, aggression, and depression."  (*Id.*)  Dr. Stahl was unable to comment on how Plaintiff would function in a work setting, but mentioned that he did not always keep his mental health treatment appointments.  (*Id.* at 244-45.)

### iii.   Further Appointment Records (June 2011 – July 2011)

Plaintiff returned to see Dr. Stahl on June 14, 2011.  (*See generally id.* at 621-25.)  At that time, Dr. Stahl noted that Plaintiff had had a prolonged lapse in medical treatment, due to

insurance problems.  (*Id*. at 621.)  Plaintiff told Dr. Stahl that he was only drinking and smoking

on weekends.  (*Id*.)  Plaintiff complained of persistent foot pain and reported difficulty

swallowing pills, but otherwise did not suffer from dysphagia.[11]  (*Id*.)  Dr. Stahl also noted that

he appeared anxious on examination.  (*Id*. at 622.)  Dr. Stahl diagnosed Plaintiff with

uncontrolled diabetes, alcohol abuse, and vocal cord disease.  (*Id*. at 623.)  Dr. Stahl stated that

she discussed the dangers of alcohol abuse with Plaintiff (*id*.), and she prescribed Plaintiff

Januvia (*id*.).[12]

　　　　Plaintiff saw Dr. Stahl again on July 21, 2011.  (*See id*. at 615-19.)  Plaintiff asked for a

refill of Celexa,[13] which had been prescribed to him at Metropolitan Hospital following a suicide

attempt (*see infra* at Background Section A(2)(b).), because he thought it made his mood more

stable and helped with his neuropathy (R. at 615).  Dr. Stahl noted that Plaintiff's diabetes was

"poorly controlled on oral therapy" and prescribed Plaintiff a glucometer, so that he could check

his blood sugar prior to beginning insulin therapy.  (*Id*. at 617.)  Regarding Plaintiff's diagnosed

bipolar II disorder,[14] Dr. Stahl noted that Plaintiff had been taking his medication, appeared more

stable and denied any suicidal ideation.  (*Id*.)

---

[11] Dysphagia is difficulty swallowing.  *See* http://www.mayoclinic.org/diseases-conditions/dysphagia/basics/definition/con-20033444 (last accessed Feb. 2, 2015).

[12] Januvia is an oral diabetes medication that controls blood sugar levels.  *See* http://www.drugs.com/januvia.html (last accessed Feb. 2, 2015).

[13] Celexa is the brand name for Citalopram, an antidepressant in a group of drugs known as selective serotonin reuptake inhibitors.  *See* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html (last accessed Feb. 2, 2015).

[14] Dr. Stern diagnosed Plaintiff with bipolar II disorder on June 2, 2011.  (*See infra* at Background Section A(1)(c)(iii).)  Bipolar II disorder is considered less severe than bipolar I disorder.  It is characterized by "elevated mood, irritability, and some changes in . . . functioning," although generally not enough to disrupt daily routines severely.  In patients with bipolar II, periods of depression typically last longer than periods of hypomania.  *See*

### iv.    <u>Treating Physician Wellness Plan Report</u>
### <u>(July 28, 2011)</u>

On July 28, 2011, Dr. Stahl filled out a Treating Physician Wellness Plan Report.  (*Id.*
at 437-38.)  She stated that Plaintiff was compliant with treatment at that time, but had a history
of noncompliance due to lack of insurance.  (*Id.* at 437.)  She noted Plaintiff's history of diabetes
and severe peripheral neuropathy (*id.*), and indicated that his diabetes was previously poorly
controlled, likely due to his psychiatric illness and lack of insurance (*id.*).  Dr. Stahl opined that
Plaintiff was employable with limitations due to a lack of sensation in his feet.  (*Id.* at 438.)  As a
result of that condition, Dr. Stahl concluded that Plaintiff should avoid physical labor or
activities that required him to climb ladders.  (*Id.*)

### v.    <u>Post-Hearing Appointment Record</u>
### <u>(October 27, 2011)</u>

Following his administrative hearing on October 19, 2011, Plaintiff had an appointment
with Dr. Stahl on October 27, 2011.[15]  (*Id.* at 602-08.)  At this appointment Plaintiff reported
completely abstaining from alcohol after his hospital admission.  (*Id.* at 602.)  Plaintiff was
diagnosed with diabetes, peripheral neuropathy, a history of mental health disorder, and tobacco
use disorder.  (*Id.* at 604.)  He described his foot pain as 6 out of 10 in severity.  (*Id.* at 603.)  Dr.

---

http://www.mayoclinic.org/diseases-conditions/bipolar-disorder/basics/symptoms/con-20027544
(last accessed Feb. 2, 2015).

[15] On September 15, 2011, Plaintiff visited Dr. Andrea Card, a colleague of Dr. Stahl's,
for an "acute visit."  (*See generally id.* at 611-14.)  Dr. Card recorded impressions of
hypomagnesaemia (abnormally low levels of magnesium in the blood, see
http://www.nice.org.uk/advice/esuom4/ifp/chapter/what-is-hypomagnesaemia (last visited on
Feb. 8, 2015), and uncontrolled diabetes mellitus, likely due to poor adherence to a medication
schedule.  (R. at 613.)  Plaintiff was cooperative, well-appearing, had intermittent eye contact
and a blunted affect.  (*Id.* at 611-12.)  He denied any plan of self-harm.  (*Id.* at 612.)

Stahl re-filled Plaintiff's Celexa prescription, increased Plaintiff's dose of Gabapentin, and referred him to a podiatrist.  (*Id.* at 604.)

### b.   Plaintiff's Sessions with Social Worker (Rodriguez) (December 2009 – April 2011)

On December 23, 2009, a day on which he also saw Dr. Stahl (*see supra*), Plaintiff was referred to social worker Rodriguez (R. at 369).  Plaintiff reported to Rodriguez that he had a "long history of depression," including multiple suicide attempts; he specifically reported that, just a few days earlier, he had taken "some 20-25 pain pills," which he reportedly "slept off." (*Id.*)   He also reported that he and his girlfriend had just broken up.  (*Id.*)  Rodriguez reported that he "was able to engage [Plaintiff] and have him agree to avoid hurting himself."  (*Id.*)  He diagnosed Plaintiff with depressive disorder not otherwise specified, and set up an appointment with a psychiatrist (Dr. Stern).  (*Id.*)

On December 30, 2009, Plaintiff once again met with social worker Rodriguez.  (*Id.* at 368.)  He explained that he was feeling "much better."  (*Id.*)  Plaintiff reported that he had first tried to hurt himself when he was 17 years old, following a dispute with his mother.  (*Id.*)  He also explained that he had first started using drugs at age 15, but that, except for using cocaine once or twice a month "to relax," he had been drug free for three years.  (*Id.*)  Rodriguez noted that despite Plaintiff's drug use and self-destructive behavior, Plaintiff had not previously sought the help of a psychiatrist, therapist, or drug counselor.  (*Id.*)  Rodriguez stated that he and Plaintiff "addressed abandonment, loss, unresolved grief, feeling alone, anger, bitterness and resentments."  (*Id.*)  Rodriguez noted that Plaintiff was "clearly depressed with most of the depressive symptoms in play," and diagnosed Plaintiff with depressive disorder.  (*Id.*)  The follow-up plan recorded by Rodriguez was for Plaintiff to see him "twice a month to address the

issues and reduce his symptoms [and] identify his core issues and learn new tools to manage his self-destructive tendencies."  (*Id*.)

Plaintiff next met with Rodriguez on January 13, 2010.  (*Id*. at 367.)  Plaintiff explained that, on New Year's Eve, he "had a confrontation" with another man, after which he had contemplated suicide.  (*Id*.)  He said, however, that, since that day, he had felt "good" and that "[e]very day has been beautiful since then."  (*Id*.)  Rodriguez noted the Plaintiff was "fully aware that he too impulsively becomes potentially self-destructive."  (*Id*.)

Plaintiff met with Rodriguez again on February 19, 2010.  (*Id.* at 366.)  Rodriguez noted that Plaintiff was "in a good mood and positive state of mind."  (*Id*.)  At that time, Plaintiff reported that he was planning to move out of his girlfriend's apartment, and he described his dedication to a new job.  (*Id*.)  He also explained that he was reducing the amount of alcohol he consumed, and Rodriguez challenged him to cut down even more.  (*Id.*)  Rodriguez noted that Plaintiff "was exceptionally alert and engaged in [their] discussion" and that Plaintiff "demonstrated a greater sense of understanding and insight."  (*Id*.)  Rodriguez again reported his diagnosis of depressive disorder, and noted that an appointment was made for Plaintiff to see Dr. Stern.  (*Id*.)

On April 12, 2011, Plaintiff saw Rodriguez for the first time since February 2010.  (*Id.* at 364.)  Plaintiff reported that he had attempted suicide four times since he had last seen Rodriquez, and that he was also not working.  (*Id*.; *see also infra* at Background Section A(2).)  Rodriguez described Plaintiff as being "in a very bad way," as he cried throughout the visit and admitted to drinking and smoking "herb."  (*Id*.)  Plaintiff reported that he had not seen his physician, Dr. Stahl, and that he had "let [him]self go [and] . . . did nothing about [his] cancer or diabetes."  (*Id*.)  He expressed a willingness to return to Dr. Stahl for treatment.  (*Id*.)  He

reported not having had a good experience with his psychiatrist, Dr. Stern, but Rodriguez noted

that Plaintiff's "expectations were not reasonable."  (*Id.*)  Rodriguez also noted that Plaintiff was

willing to reconsider medication and scheduled Plaintiff for a follow-up appointment.  (*Id.*)

### c. Evaluation and Treatment by Psychiatrist (Dr. Stern)

#### i. Initial Appointment Records
#### (April 2010)

Plaintiff first visited his psychiatrist, Dr. Stern, on April 1, 2010.  (*Id.* at 365.)  At this

appointment, Plaintiff explained how he was "all alone," as he "[did not] have any family left."

(*Id.*)  He stated that he had attempted suicide many times and often "pick[ed] fights with drug

dealers and other bad people."  (*Id.*)  He reported to Dr. Stern that he used "alcohol, marijuana,

and occasionally cocaine."  (*Id.*)  Plaintiff also reported that he used to hear voices, although this

was "many years ago."  (*Id.*)  When Dr. Stern suggested the possibility of prescribing

medication, Plaintiff "very clearly rejected the idea."  (*Id.*)  Plaintiff became "tearful and angry"

when Dr. Stern told him that he would see him only occasionally, and that Rodriguez would be

Plaintiff's primary contact for therapy.  (*Id.*)  Dr. Stern noted a "labile, mostly angry affect and

mostly angry mood, [thought process] coherent, no active [suicidal or homicidal ideation] at

present, no overt delusions/hallucinations."  (*Id.*)  The psychiatrist's impressions were that

Plaintiff suffered from "characterologic anger, and may suffer from mood [disorder]…; [rule

out] mild schizoaffective [disorder]; [and] intermittent insomnia."  (*Id.*)

#### ii. Treating Physician's Wellness Plan Report
#### (May 2011)

On May 25, 2011, Dr. Stern, together with Rodriguez, filled out a Treating Physician's

Wellness Plan Report on behalf of Plaintiff.  (*Id.* at 378-80.)  In this report, Plaintiff's diagnoses

were reported to be major depressive disorder with symptoms of profound characterological

11

anger, insomnia, loss of pleasure, self-destructive and impulsive behavior, hopelessness, mood

changes, decreased motivation, irritability, racing and obsessive thoughts, anxiety, difficulty with

temper control, and aggressiveness.  (*Id*. at 379.)  The report noted that Plaintiff had recently

restarted treatment after missing scheduled appointments and was scheduled to see a therapist

two-to-four times per month and a psychiatrist every two months.  (*Id*.)  Dr. Stern and Rodriguez

opined that Plaintiff would be unable to work for at least 12 months.  (*Id*. at 380.)[16]

### iii.      Further Appointment Records
### (June – July 2011)

On June 2, 2011 Plaintiff visited Dr. Stern for the first time since April 2010.  (*Id*.

at 626.)  Plaintiff reported intermittent feelings of suicidality and sporadic desires to hurt others.

(*Id*.)  Plaintiff indicated that, in the past, he had used cocaine heavily and had consumed alcohol

every day.  (*Id*.)  He stated, however, that he was currently only drinking alcohol on weekends.

(*Id*.)  A mental status exam was notable for labile affect and mood, coherent thought process, no

active suicidal or homicidal ideation, and no overt delusions or hallucinations.  (*Id*.)  Dr. Stern

---

[16] On the same day that Dr. Stern and Rodriguez filled out this report, Plaintiff also met with Dr. Deborah Swiderski of Montefiore, for a physical examination for Federation Employment and Guidance Services ("FEGS").  (*Id*. at 628; *see also* http://www.fegs.org/what-we-do/employment-workforce/jobseekers/wecare#.VMrbS3vYhdA (last visited Feb. 1, 2015) (describing FEGS WeCare as a New York City program that "helps cash assistance applicants and recipients with complex clinical barriers to employment, including medical, mental health, and substance abuse conditions, to obtain employment or federal disability benefits").)  Plaintiff told the Montefiore staff that he was being asked to work, but that he did not feel able to, "due to back an[d] leg pain."  (R. at 628.)  Plaintiff stated that he had not been taking his diabetes medication or going to doctor's appointments because of problems with Medicaid.  (*Id*.)  Plaintiff also reported smoking about a pack of cigarettes on days when he drank, which, he said, were Friday and Saturday.  (*Id.*)  Plaintiff indicated that, when he did drink, he consumed a liter of malt liquor and two pints of vodka.  (*Id.*)  He was diagnosed with diabetes mellitus, hyperlipidemia, peripheral neuropathy, and malignant neoplasm of glottis (*i.e.*, laryngeal cancer).  (*Id*. at 629-30; *see also* http://www.nlm.nih.gov/medlineplus/cancer.html (last accessed Feb. 2, 2015); http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0022325/ (last accessed Feb. 2, 2015).)

diagnosed Plaintiff with bipolar II disorder, with "characterologic anger problems and possible

[post-traumatic stress disorder] in addition to mood disorder."  (*Id.* at 626.)  He prescribed

Plaintiff Geodon.[17]  (*Id.* at 627.)

On July 20, 2011, Plaintiff saw Dr. Stern again.  (*Id.* at 620.)  Plaintiff reported feeling

better and calmer.  (*Id.*)  A mental status examination was notable for less anxious affect and

"ok" mood, coherent thought process, no active suicidal or homicidal ideation, and no overt

delusions or hallucinations.  (*Id.*)  Dr. Stern recorded the diagnosis of bipolar II disorder, noted

that Plaintiff was less depressed and less anxious, and recommended that Plaintiff continue

taking Celexa and Geodon.  (*Id.*)

### iv. First Psychiatric/Psychological Impairment Questionnaire (August 10, 2011)

On August 10, 2011, Dr. Stern completed a Psychiatric/Psychological Impairment

Questionnaire regarding Plaintiff's mental health.  (*See generally id.* at 344-51.)  Using the

multiaxial method of assessment,[18] Dr. Stern diagnosed Plaintiff, on Axis I, with bipolar

disorder, rule out PTSD, and, on Axis II, with borderline personality traits.[19]  (*Id.* at 344.)  On

---

[17] Geodon is the brand name for Ziprasidone, a medication that is used to treat symptoms of schizophrenia, as well as episodes of mania in individuals with bipolar disorder.  *See* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699062.html (last accessed Feb. 2, 2015).

[18] The multiaxial system of assessment "involves an assessment on several axes, each of which refers to a different domain of information."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 27 (4th ed. rev. 2000) ("DSM-IV"). Axis I refers to clinical disorders and other conditions that may be the focus of clinical attention; Axis II refers to personality disorders and mental retardation; Axis III refers to general medical conditions that may be relevant to the understanding or management of the individual's mental disorder; Axis IV refers to psychosocial and environmental problems that may affect the diagnosis, treatment, and prognosis of mental disorders; and Axis V refers to Global Assessment of Functioning ("GAF").  *Id.*

[19] Borderline personality traits include:  impulsive and risky behavior; unstable or fragile self-image; unstable and intense relationships; up and down moods, often as a reaction to threats

13

Axis III, Dr. Stern reported diabetes mellitus and arthritis, and, on Axis IV, he reported "multiple

stressors." (*Id.*)  As to Axis V, Dr. Stern recorded that Plaintiff's current GAF was 40 and that

his lowest GAF in the past year was 35.[20]  (*Id.*)  Dr. Stern found that Plaintiff's prognosis was

guarded and unpredictable.  (*Id.*)  Dr. Stern noted that the positive clinical findings that

supported his diagnoses included Plaintiff's poor memory, appetite disturbance with weight

change, sleep disturbance, personality change, mood disturbance, anhedonia (pervasive loss of

interest), paranoia (inappropriate suspiciousness), feelings of guilt/worthlessness, difficulty

thinking/concentrating, suicidal ideation or attempts, social withdrawal or isolation, decreased

energy, persistent irrational fears, generalized persistent anxiety, and hostility and irritability.

(*Id.* at 345.)  He noted that Plaintiff's primary symptoms were depressed mood, loss of pleasure,

feeling worthless and hopeless, reduced energy, suicidality, self-destructive behavior, irritability,

racing thoughts, sleep disturbance, impaired concentration, anxiety, inability to control temper,

aggressiveness, and anger.  (*Id.* at 346.)  Plaintiff's most frequent and severe symptoms were

reported to be his suicidality, his inability to control his temper, his feelings of hopelessness, and

his impulsivity.  (*Id.*)  Dr. Stern reported that Plaintiff had been hospitalized at least four times

following suicide attempts.  (*Id.*; *see also infra* at Background Section A(2).)

---

of self-injury; intense fear of being alone or abandoned; ongoing feelings of emptiness; frequent
and intense displays of anger; and stress-related paranoia that comes and goes. *See*
http://www.mayoclinic.org/diseases-conditions/personality-disorders/basics/symptoms/con-
20030111 (last accessed Feb. 2, 2015).

[20] The GAF scale, a scale from 0 to 100, was previously used by clinicians to report their
judgment of an individual's overall level of functioning.  DSM-IV at 32-34.  A GAF of 31 to 40
meant that an individual had "[s]ome impairment in reality testing or communication" or "major
impairment in several areas, such as work or school, family relations, judgment, thinking, or
mood." *Id.* at 34. The most recent (2013) addition of the manual, however, "has dropped the use
of the [GAF] scale." *Restuccia v. Colving*, No. 13cv3294 (RMB), 2014 WL 4739318, at *8
(Sept. 22, 2014) (quoting *Mainella v. Colvin,* No. 13cv2453, 2014 WL 183957, at *5 (E.D.N.Y.
Jan. 14, 2014)).

Dr. Stern found that Plaintiff had some degree of limitation in every domain of mental or social functioning (and in every sub-area of activity) that was listed in the questionnaire.  (*See id*. at 347-49.)  Dr. Stern found that Plaintiff was "markedly limited" in 10 areas, specifically in his ability to:  "understand and remember detailed instructions"; "maintain attention and concentration for extended periods"; "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance"; "sustain an ordinary routine without supervision"; "work in coordination with or proximity to others without being distracted by them"; "complete a normal workweek without interruptions from psychologically based symptoms and . . . perform at a consistent pace without an unreasonable number and length of rest periods"; "interact appropriately with the general public"; "get along with co-workers or peers without distracting them or exhibiting behavioral extremes"; "maintain socially appropriate behavior and . . .  adhere to basic standards of neatness and cleanliness"; and "set realistic goal or make plans independently."  (*Id*. at 347-49.)  He listed Plaintiff as moderately limited in seven areas, specifically regarding Plaintiff's ability to:  "remember locations and work-like procedures"; "understand and remember one or two step instructions"; "carry out detailed instructions"; "make simple work related decisions"; "accept instructions and respond appropriately to criticism from supervisors"; "respond appropriately to changes in the work setting"; and "travel to unfamiliar places or use public transportation."  (*Id*. at 347-49.)  Finally, he listed Plaintiff as having mild limitations in the remaining three areas, which included the ability to:  "carry out simple one or two-step instructions"; "ask simple questions or request assistance"; and "be aware of normal hazards and take appropriate precautions."  (*Id*. at 347-49.)

Dr. Stern also found that Plaintiff would likely experience episodes of deterioration and decompensation in work or work-like settings, due to his "impulsive, reactionary, [and] angry"

behavior.  (*Id*. at 349.)  He reported that Plaintiff was taking Geodon and Celexa.  (*Id*.)  Dr. Stern

also reported that he expected Plaintiff's mental impairments to be ongoing for at least 12

months.  (*Id*. at 350.)  He opined that Plaintiff could not even handle low stress work, due to a

diminished capacity to manage temper and aggression.  (*Id*.)  He stated that Plaintiff had "good

days" and "bad days" and that, as a result of his condition, Plaintiff could be expected to miss

work more than three times a month.  (*Id*. at 350-51.)  Dr. Stern opined that Plaintiff's symptoms

and limitations had been present from adolescence, but that Plaintiff could still manage benefits

in his own best interest.  (*Id*. at 351.)

**v.      Additional Appointment Records**
**(October 2011)**

On October 18, 2011, Plaintiff had an appointment with Dr. Stern and disclosed that he

had tried to kill himself about seven times since his last appointment and that he had been

admitted to Bellevue.  (*Id*. at 609; *see also infra* at Background Section A(2)(d).)  Upon a mental

status examination, Plaintiff was found to have a calm affect, but an "extremely labile mood."

(R. at 609.)  Plaintiff was reported as having no active suicidal ideations, delusions, or

hallucinations at the time of the appointment.  (*Id*.)  Dr. Stern stated that Plaintiff "[had] been

abusing alcohol, which [had] exacerbated [his] suicidality."  (*Id*.)  He recorded Plaintiff's

diagnosis of bipolar II disorder.  (*Id*.)

**vi.     Letter Regarding Plaintiff's Ability to Work**
**(October 2011)**

On the same day, October 18, 2011, Dr. Stern, together with Rodriguez, wrote a letter,

apparently in support of Plaintiff's claim for disability benefits, describing Plaintiff's problems.

(*Id*. at 386.)  Dr. Stern and Rodriguez confirmed that Plaintiff was under their care for:

hypomagnesaemia, bipolar II disorder, preventive healthcare, peripheral neuropathy, malignant

16

neoplasm of glottis, vocal cord disease, alcohol abuse, tobacco use disorder, mental disorder, hyperlipidemia, and diabetes mellitus. (*Id.*) The letter described Plaintiff's longstanding history of depression with multiple hospitalizations because of suicide attempts or suicidal ideation, and explained that Plaintiff had ongoing problems with profound characterological anger, insomnia, loss of pleasure, feelings of hopelessness, decreased motivation, irritability, racing and obsessional thoughts, anxiety, impulsivity, and aggression. (*Id.*) The letter also explained that Plaintiff was currently undergoing treatment for major depressive disorder, bipolar disorder, and rule out mood disorder, and was taking Abilify,[21] Celexa and Doxepine.[22] (*Id.*) Dr. Stern and Rodriguez stated that it was "difficult to imagine [Plaintiff] managing the world of work at this time; he will have difficulties managing authority figures, could easily be triggered into confrontations with co-workers and supervisors and will not likely adhere to normal expectations." (*Id.*) They stated that it would take at least a year before they could determine whether Plaintiff "ever" would be able to "manage his condition, reduce his symptoms and be stable enough to tolerate the world of work." (*Id.*)

**vii.   Second Psychiatric/Psychological
Impairment Questionnaire
(December 2011)**

On December 6, 2011 Dr. Stern provided a second Psychiatric/Psychological Impairment Questionnaire, stating opinions were similar to the ones he provided on August 10, 2011. (R. at 1153-60; *see also supra* at Background Section A(1)(c)(iv).) Dr. Stern again opined that

---

[21] Abilify is the brand name for Aripiprazole, a medication used to treat the symptoms of schizophrenia. *See* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603012.html (last visited Jan. 30, 2015).

[22] Doxepine is a medication used to treat depression and anxiety. *See* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682390.html (last visited Jan. 30, 2015).

Plaintiff was incapable of handling even a low-stress work environment and that Plaintiff would likely miss more than three days of work per month.  (*Id*. at 1159-60.)

### viii.   Letter Regarding Plaintiff's Substance Abuse (December 2011)

On December 23, 2011, Dr. Stern, again together with social worker Rodriguez, submitted a form to the ALJ in which he opined that Plaintiff's use of alcohol and drugs was a symptom of his mental condition, and/or a form of self-medication.  (*Id*. at 1173.)  Thus, Dr. Stern concluded that Plaintiff's disability was independent of any substance abuse, and that Plaintiff's alcohol consumption was not material to his disability.  (*Id*.)

### 2.   Other Hospital Records

In addition to the Montefiore records described above (from the internist, psychiatrist and social worker whom Plaintiff saw regularly), the Record also contains a number of contemporaneous records from other hospitals, many of them stemming from emergency room visits, following Plaintiff's numerous suicide attempts.  Some of those suicide attempts are mentioned above, in the records of Plaintiff's sessions with the physicians and other staff at Montefiore.  The additional hospital records contained in the administrative Record may be summarized as follows:

### a.   Lincoln Hospital (December 3-4, 2010; March 19-21, 2011)

Records of Lincoln Medical and Mental Health Center ("Lincoln") show that, on December 3, 2010, Plaintiff was brought to the emergency room there, after cutting himself on the abdomen with a razor.  (*See generally id.* 923-1152.)  Attending physician, Dr. Jorge Otero, diagnosed Plaintiff with depressive disorder with suicidal gestures.  (*Id*. at 930.)  Tests conducted that day showed that Plaintiff had a blood alcohol level of 355 mg/dL, and his urine test results

were positive for THC[23] and cocaine.  (*Id*. at 930, 951-52 (unconfirmed), 966.)  Dr. Pronoy K.

Roy examined Plaintiff on December 4, 2010 and found that Plaintiff had a history of psychiatric

and substance abuse issues, and noted that he "presented with depression [and] suicidal

ideation," given that he had cut himself.  (*Id*. at 928.)  Dr. Roy concluded that Plaintiff was a

danger to himself and "need[ed] inpatient stabilization."  (*Id*.)

When he was first admitted to Lincoln, Plaintiff was combative, so hospital staff had him

sedated.  (*Id*. at 1140, *see also id*. at 966.)  After a later psychiatric evaluation was conducted,

Plaintiff was diagnosed, on Axis I, with major depressive disorder (moderate), cannabis

dependence, and alcohol abuse.  (*Id*. at 1010.)  On Axis III, he was diagnosed with throat cancer,

high cholesterol and diabetes and, on Axis IV, the doctor noted that Plaintiff had no family

support and suffered from financial problems, including having his Medicaid cut off.  (*Id*.)  His

GAF score was reported to be 40 to 45.[24]  (R. at 1011.)  Plaintiff reported that he had previously

been seeing Rodriguez for therapy, but that he had stopped going after about four or five months

because he had lost Medicaid coverage.  (*Id*. at 1008.)

According to a Psychiatric Emergency Service Assessment of Plaintiff performed at the

hospital, Plaintiff was admitted after he told his girlfriend that he was going to kill himself.  (*Id*.

at 1007.)  When EMS arrived, he was found to have multiple lacerations on his abdomen.  (*Id*.)

He said that he had cut himself because he was "very stressed out."  (*Id*.)  The records indicate

---

[23] THC is the active ingredient in marijuana.  *See*
http://www.nlm.nih.gov/medlineplus/marijuana.html (last visited, Jan. 30, 2015).

[24] A GAF score in the 41-50 range was understood to show that an individual had
"serious symptoms" or "any serious impairment in social occupational, or school functioning."
*See* DSM-IV at 34.  A GAF score in the 31-40 range was understood to show that an individual
had "[s]ome impairment in reality testing or communication" or "major impairment in several
areas, such as work or school, family relations, judgment, thinking, or mood."  *Id*.

that, at first, Plaintiff had difficulty identifying the stressors that motivated his suicidal ideation, but he eventually reported that he felt alone and that he was particularly depressed because the holidays were approaching and he had no family to celebrate with.  (*Id.*)  Plaintiff denied that his substance use was "dangerous" and said that he only drank one pint of beer per day.  (*Id.* at 1010.)  His girlfriend, however, told the hospital that Plaintiff drank liquor "all day, every day," often blacked out, and got into fights with strangers on the street.  (*Id.*)  She also reported that he used cocaine on weekends, although Plaintiff denied any drug use besides marijuana. (*Id.*)  She also said that Plaintiff only became suicidal when he was drunk.  (*Id.* at 1011-12; *see also id*. at 1008.)  On December 4, 2010, Plaintiff was transferred to Metropolitan Hospital Center ("Metropolitan") because there was no available bed at Lincoln.  (*Id*. at 1120; *see also infra* at (b) regarding this transfer).)

On March 19, 2011, though, Plaintiff was again hospitalized at Lincoln following another episode of suicidal behavior.  (*See generally* R. at 636-922.)  He was found on a park bench holding a box cutter to his face and threatening to kill himself.  (*Id*. at 642, 653.)  The records state that Plaintiff was determined to have had a history of depressive disorder and substance dependence, and that he "present[ed] to the hospital intoxicated and crying."  (*Id*. at 653.) Plaintiff was described as having slurred speech, appearing lethargic, and having alcohol on his breath.  (*Id*.)  He reported that he was homeless and that he had been drinking a pint of vodka. (*Id*.)  He stated that he became suicidal when he started thinking of deceased family members. (*Id*.)  Plaintiff was diagnosed with substance induced mood disorder, cocaine and alcohol dependence, and alcohol intoxication.  (*Id*.)

At that time, Plaintiff tested positive for cocaine and had an alcohol level of 287 mg/dL. (*Id*. at 660, 704.)  An emergency service assessment was performed, and Plaintiff was recorded

as having a depressed mood and impaired impulse control, judgment, and insight. (*Id.* at 662-63.) Plaintiff's attitude was reported to be cooperative and his speech was pressured but fluent. (*Id.* at 662.) Plaintiff's thought process was reported to be coherent and goal-directed. (*Id.*) The assessment also showed that Plaintiff had no insight into his substance use. (*Id.* at 663.) Plaintiff was diagnosed, on Axis I, with depressive disorder with suicidal gestures, cocaine abuse, borderline personality disorder, and alcohol dependence. (*Id.* at 664.) On Axis II, Plaintiff was diagnosed with borderline personality disorder, and, on Axis III, with hypertension and diabetes. (*Id.*) Plaintiff's GAF was recorded as 30.[25] (R. at 664.) At the hospital, Plaintiff reported drinking one pint of vodka daily, smoking marijuana daily, and using cocaine on weekends. (*Id.* at 666-67.) He denied that his substance use was dangerous and stated that he had never been in detoxification or rehabilitation programs. (*Id.* at 666.)

On March 21, 2011, Plaintiff was seen by Dr. Madeleine O'Brien. (*Id.* at 693.) Dr. O'Brien reported that she called Plaintiff's girlfriend, who informed the doctor that Plaintiff's most recent suicide attempt was an isolated incident, that Plaintiff had not been depressed, but that sometimes he drank too much alcohol and became morose. (*Id.* at 693.) At the time of the appointment, Plaintiff denied any suicidal ideation. (*Id.* at 693.) He explained that, on the night he was hospitalized, he was sitting on the park bench and feeling increasingly depressed, after having used cocaine and alcohol. (*Id.* at 693-94.) Noting his lack of present suicidal ideation, the hospital discharged Plaintiff after he met with an addiction counselor. (*Id.* at 694-96.)

---

[25] A GAF score in the range of 21-30 was understood to indicate that an individual displayed behavior "considerably influenced by delusions or hallucinations," had "serious impairment in communication or judgment," or had an "inability to function in almost all areas." DSM-IV at 34.

**b.**   **Metropolitan Hospital**
**(December 4-9 and 15, 2010; January 5, 2011)**

The first reference in the Record to Metropolitan appears on December 4, 2010, when, as noted above, Plaintiff was transferred there from Lincoln.  (*See supra*; *see also* R. at 1120.)  On December 5, 2010, Plaintiff was evaluated in Metropolitan's Psychiatric Emergency Department, and was diagnosed, on Axis I, with major depressive disorder, polysubstance abuse, rule out substance induced mood disorder.  (R. at 557.)  On Axis III, Plaintiff was diagnosed with diabetes mellitus, hyper cholesterolemia, and history of throat cancer.  (*Id.*)  On Axis IV, the doctor noted "economic, primary support group, [and] psychosocial," and, on Axis V, he recorded a GAF of 30.[26]  (*Id.*)  On December 7, 2010, a therapist at Metropolitan noted that Plaintiff "frequently" followed directions, organized materials, had well-coordinated motions, solved problems independently, completed tasks, and expressed self-creativity.  (*Id.* at 523.)  Plaintiff was discharged from Metropolitan on December 9, 2010.  (*Id.* at 317, 381.)

Records then show that, on December 15, 2010, Plaintiff attended outpatient counseling at Metropolitan.  (*See generally id.* at 481-82, 487-88.)  He was seen by Joyce Baumboltz-Racz, LCSW, and Dr. Carmen I. Leon, who described Plaintiff as "angry looking" and recorded that he had "mood swings, anger outbursts where [he] [would] hit[] a wall or look[] for a fight, [and] poor impulse control."  (*Id.* at 487.)  Plaintiff reported drinking one pint of alcohol and smoking THC every day, and using cocaine every weekend.  (*Id.*)  Plaintiff was diagnosed with cocaine abuse unspecified, on Axis I, and borderline personality disorder, on Axis II.  (*Id.* at 488.)  Baumholtz also noted that Plaintiff was then on Celexa for depression.  (*Id.*)

---

[26] *See* n.25, *supra.*

Finally, on January 5, 2011, Plaintiff returned to Metropolitan for a follow-up appointment.  (*Id*. at 484-85.)  A mental status exam revealed a guarded, negative and resistant attitude, normal psychomotor activity, alert concentration, an irritable mood, blunted affect, fair impulse control, intact thought process, mild judgment, and no suicidal or homicidal ideation. (*Id*. at 484.)  The exam also showed that Plaintiff was aware of his need for treatment.  (*Id*.)  At this appointment, Plaintiff's urine tested positive for cocaine.  (*Id*.)  The attending psychiatrist referred Plaintiff to a chemical dependency program, but Plaintiff refused treatment, stating that he could stop using drugs whenever he wanted to do so.  (*Id*.)  The attending psychiatrist ultimately "agree[d] with closing [the] case of this patient who refuses to address substance abuse issues."  (*Id*. at 485.)

### c.　　FEGS Biopsychosocial Evaluation at Bronx Lebanon Hospital (March 17, 2011)

The Record also contains a report of a FEGS biopsychosocial evaluation of Plaintiff, conducted on March 17, 2011, at Bronx Lebanon Hospital ("Bronx Lebanon").  (*See generally id.* at 439-74; *see also supra* n.16 (regarding "FEGS").)  At this evaluation Plaintiff reported feelings of depression, loss of interest or pleasure and fatigue, as well as appetite and sleeping abnormalities.  (*Id*. at 449.)  He had a PHQ-9 score of 21.[27]  (*Id*.)  Plaintiff also reported a history of suicide attempts beginning at age 36, but he denied any history of alcohol or substance abuse. (*Id*. at 448-53.)  He stated that he had been seeing social worker Rodriguez for about six months, but had not seen him for a year and a half because his Medicaid was cut off.  (*Id.* at 450.) Plaintiff reported suicidal ideation with plan and intent.  (*Id*.)  He stated that, after his last suicide

---

[27] The PHQ-9 is a test that measures the severity of depression.  A score above 20 indicates severe depression.  *See* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495268/ (last accessed Feb. 2, 2015).

attempt three months earlier, he was referred to a psychiatrist, but "since they [would not] give him medicine[,] he stopped going." (*Id*.) Plaintiff reported that he found it difficult to work, take care of things at home, and get along with others. (*Id*.) He reported that his daily activities included washing dishes and clothes, sweeping, mopping, and vacuuming his floor, watching television, making beds, shopping for groceries, cooking meals, reading, socializing, and grooming. (*Id*. at 451.) A physical examination revealed tenderness, swelling, and edema in Plaintiff's paraspinal muscles and lower back, and decreased range of motion in Plaintiff's right shoulder. (*Id*. at 459.) Plaintiff was diagnosed with diabetes mellitus, disorders of the autonomic nervous system, joint derangement, hypertension and depressive disorder. (*Id*. at 463.) Dr. Charles Pastor concluded that Plaintiff had unstable medical and/or mental health conditions, including major depressive disorder and neuropathy, that required treatment before a functional capacity determination could be made regarding Plaintiff's ability to work. (*Id*. at 464.)

### d. Bellevue Hospital
### (August 21-23, 2011; September 16, 2011)

On August 21, 2011, Plaintiff was admitted to the Bellevue Hospital Center ("Bellevue") after another seeming suicide attempt, in which he threw himself down a flight of subway stairs. (*See generally id*. at 389-414.) During his hospitalization, Plaintiff was diagnosed, on Axis I, with alcohol dependence, cocaine abuse, cannabis abuse, and depressive disorder. (*Id*. at 397.) He was diagnosed with diabetes mellitus, on Axis III, and with occupational and primary support group problems, on Axis V. (*Id*.) His GAF was recorded as 55.[28] (*Id*.) At the time he was

---

[28] A GAF score in the 51-60 range was understood to signifiy "moderate symptoms or moderate difficulty in social, occupational, or school situations." *Petrie v. Astrue*, 412 F. App'x 401, 506 n.2 (2d Cir. 2011) (citing DSM-IV at 376-77).

admitted to the hospital, Plaintiff's alcohol level was at 409 mg/dL.  (*Id.* at 390.)  On initial

examination, he was "dysphoric, intoxicated and reported that he [did not] care whether he lived

or died."  (*Id.* at 394.)  Plaintiff was still walking and talking despite his high alcohol level, and

hospital staff placed him on a Librium taper,[29] as they thought he may suffer from withdrawal.

(R. at 394.)  Plaintiff reported drinking one pint of alcohol daily from Monday to Friday and one

fifth of liquor on Saturdays and Sundays.  (*Id.* at 390.)  The doctor noted that Plaintiff's alcohol

level actually suggested that he consumed more than one pint per day.  (*Id.*)  Plaintiff said that he

used to drink heavily, but that he had only started drinking every day for the past four or five

months.  (*Id.*)  He also admitted to having used marijuana and cocaine during the previous

month.  (*Id.* at 391.)  Plaintiff stated that he did not believe that his drinking interfered with his

ability to work.  (*Id.* at 390.)  Plaintiff's girlfriend told hospital staff that she thought Plaintiff

was drinking two fifths of liquor a day.  (*Id.* at 391.)  She said that Plaintiff had been a heavy

drinker for the entire five years that she had known him, but that his drinking may have increased

in the prior five months.  (*Id.* at 392.)  Even though he seemed depressed, she said that he was a

pleasant and completely different person when he was not drinking.  (*Id.* at 391.)  Plaintiff had

no history of detoxification, rehabilitation, or withdrawal.  (*Id.* at 392.)  Hospital staff were

unable to assess the effects of his alcohol abuse, at that time.  (*Id.*)

      Plaintiff told hospital staff that he had engaged in suicidal behavior on over 20 occasions,

beginning when he was in his 20s.  (*Id.* at 390, 392.)  Plaintiff said that he did not intend to kill

himself when he purposefully threw himself down the stairs, but that he did not care whether he

---

[29] A Librium taper is a detoxification medication regimen that is used to combat alcohol
withdrawal.  *See* http://www.ncbi.nlm.nih.gov/books/NBK64823/ (last accessed Feb. 2, 2015).

lived or not.  (*Id.* at 390.)  He alluded to multiple stressors in his life, but would not talk about them.  (*Id.*)

On the third day of his hospital stay, Plaintiff demonstrated a bright affect and denied any signs of depression.  (*Id.* at 395.)  Upon examination, Plaintiff appeared cooperative and well related, with normal eye contact, gait, movement, and speech.  (*Id.*)  He was reported as having a goal-directed and normal thought process, normal thought content with no suicidal ideation, full and appropriate affect, intact impulse control, full orientation, and no gross impairments in insight or judgment.  (*Id.*)  Hospital staff counseled Plaintiff on the importance of complying with his medical treatment and abstaining from alcohol.  (*Id.* at 395-96.)  He voiced understanding and confirmed a need to maintain sobriety, but refused substance-abuse treatment referrals.  (*Id.* at 396.)  Given his clinical improvement and that his suicidality was considered likely to have been secondary to substance use, Plaintiff was found safe for discharge.  (*Id.* at 395-96.)

On September 16, 2011, Plaintiff again attempted suicide and was again admitted to Bellevue.  (*See generally id.* 387-88, 415-22.)  In particular, Plaintiff reportedly tried to jump in front of a subway train while he was intoxicated with alcohol.  (*Id.* at 387.)  A urine toxicology report came back positive for cannabis and cocaine.  (*Id.*)  Upon examination on September 17, 2014, Plaintiff denied feelings of suicidality.  (*Id.*)  He informed the examining physician that he had recently lost his off-the-books job and had been asked to leave his house.  (*Id.*)  He said that he had recently told his counselor, Rodriguez, that he wanted to go into drug rehabilitation.  (*Id.*)  Plaintiff was quoted as saying "I gotta do something because I'm sick of hurting myself when I'm drunk," and "I don't want to kill myself.  I've accepted that I've lost my job and house

because of my drinking.  I want to get help with this." (*Id*.)  Plaintiff was discharged that

afternoon.  (*Id*. at 415.)

### 3.   Consultative Reports

#### a.   Internal Medicine Examination
(Dr. William Lathan, November 2010)

Dr. William Lathan performed an internal medicine examination of Plaintiff on

November 16, 2010.  (*See generally id.* at 281-84.)  Dr. Lathan noted that Plaintiff "ha[d] been

treated by a psychiatrist since 2008 for depression." (*Id*. at 281.)  He reported that Plaintiff had a

history of hypertension, diabetes, diabetic neuropathy in his lower extremities, depression, and

neoplastic throat nodules.  (*Id*. at 283.)  He reported that Plaintiff's prognosis was "stable." (*Id*.)

Dr. Lathan opined that Plaintiff had a "moderate restriction in prolonged standing and walking."

(*Id*.)  He also found that Plaintiff was "appropriate in dress and affect and [was] cooperative" and

could "perform all activities of personal care and daily living." (*Id*. at 281.)  Dr. Lathan reported

that Plaintiff "den[ied] the use of tobacco, alcohol, [and] street drugs." (*Id*.)

#### b.   Psychiatric Consultative Examination
(Dr. Dmitri Bougakov, November 2010)

Dmitri Bougakov, Ph.D., a consultative psychologist, conducted a psychiatric evaluation

of Plaintiff on November 16, 2010, at the request of the Social Security Administration.  (*See

generally id.* at 277-80.)  During this evaluation, Plaintiff complained of difficulty falling asleep,

increased appetite, "feeling down," and having low energy.  (*Id.* at 277.)  Plaintiff described his

daily activities, which included dressing and grooming himself, occasionally cooking, dropping

his clothes at the Laundromat, and staying home watching television in lieu of socializing with

friends and family.  (*Id*. at 278-79.)  Plaintiff also reported that he could manage money and take

public transportation.  (*Id.* at 279.)  Dr. Bougakov found that Plaintiff was cooperative and well-

groomed; was adequate in "expressive and receptive languages"; possessed fair insight and judgment; had a neutral mood; was "coherent and goal directed" in his thought process; and displayed normal gait, posture, and motor behavior, as well as appropriate eye contact. (*Id.* at 278.) Dr. Bougakov also found, however, that Plaintiff's recent and remote memory skills were mildly impaired, and that Plaintiff had average intellectual functioning with a somewhat limited fund of general information. (*Id.*) Plaintiff's attention and concentration were reported to be "[i]ntact for counting, simple calculations and serial [threes]." (*Id.*)

On the multiaxial system of assessment (*see supra* n.18), Dr. Bougakov diagnosed Plaintiff, on Axis I, with depressive disorder related to a medical condition, and, on Axis III, with laryngeal carcinoma, hypertension, diabetes and hyperlipidemia. (R. at 279.) Dr. Bougakov gave Plaintiff a "fair" prognosis, "given the fact that he [did] not present with any significant psychiatric symptomatology, and his cognitive symptoms [were] mild." (*Id.*) He also opined that Plaintiff was "somewhat limited in ability to learn new tasks and perform complex tasks" and that those difficulties were related to psychiatric symptomatology. (*Id.*) Dr. Bougakov concluded that Plaintiff could "follow and understand simple directions and instructions, perform simple tasks, maintain attention and concentration, and should be able to maintain a regular schedule" and that Plaintiff was "able to mak[e] appropriate decisions, relate adequately with others, and deal with stress." (*Id.*) He further opined that, while "[t]he results of the examination appear[ed] [to be] consistent with psychiatric problems," those problems did "not appear to be significant enough to interfere with [Plaintiff's] ability to function on a daily basis." (*Id.*)

c.      **"Psychiatric Review Technique"**
**(T. Harding, December 1, 2010)**

On December 1, 2010, psychological consultant T. Harding ("Harding") completed a

form entitled "Psychiatric Review Technique," in connection with Plaintiff's disability

application.  (*See generally id*. at 285-300.)  Harding specified that Plaintiff had a non-severe

medically determinable affective disorder (Listing 12.04).  (*Id*. at 287.) [30]

B.      **Plaintiff's Own Reports Relating To His Claimed Impairments**

Plaintiff completed a form "Disability Report" (*see id*. at 147-59), in connection with his

August 3, 2010 application for disability benefits.  He reported that he was disabled due to throat

cancer (stage unknown), diabetes, neuropathy, high blood pressure, high cholesterol, depression,

anxiety, insomnia, lower back pain, and arthritis in the right shoulder and arm.  (*Id*. at 151.)

Plaintiff reported that he had stopped working on March 1, 2009, due to those conditions, and

alleged the onset of a disability beginning on the same date.  (*Id*.)  Plaintiff reported that he had

previously been employed as a construction worker.  (*Id*. at 152.)

The Record also includes a form on which Plaintiff appears to have recorded his answers

to questions regarding his pain levels.  (*See generally id*. at 157-59.)  He indicated that he

experienced a dull and stabbing pain in his feet, back, hands and right arm that had started two

years earlier and had become progressively worse.  (*Id*. at 157.)  He also stated that lifting and

bending made him feel pain, and he listed Gabapentin, Motrin, Januvia and Metformin as

---

[30] The Record also contains two consultant reports relating solely to Plaintiff's physical
impairments:  an RFC assessment dated December 2, 2010, by someone identified only as
"C. Devost" (*see id*. at 301-06; *see also id*. at 42 (Plaintiff's counsel objecting, at the hearing, to
this report, on the ground that it was unclear whether it was filled out by "a single decision
maker or a medical consultant")), and a November 1, 2010 report by a consultative oncologist,
Dr. B. Gajwani, opining that Plaintiff's laryngeal cancer did not equal any cancer listings (*id*.
at 247-48).

medications that he took for the pain.  (*Id*. at 157-58.)  Plaintiff indicated that his daily/weekly

activities included walking, shopping, and doing household chores.  (*Id*. at 158.)

### C.  Procedural History

#### 1.  Plaintiff's Application For Benefits

Plaintiff applied for Social Security Disability benefits on August 3, 2010, alleging an

onset date of March 1, 2009.  (*Id*. at 126-34.)  SSA denied Plaintiff's claim on December 3, 2010

(*id*. at 69-74), and Plaintiff filed a request for a hearing on January 14, 2011 (*id*. at 77-83).

#### 2.  Administrative Hearing And Decision

On October 19, 2011, Plaintiff, represented by attorney Colin Sherman, Esq. of Binder &

Binder, appeared and testified before ALJ Scheer.  (*See generally id*. at 39-66.)  During the

hearing, Plaintiff's counsel argued that Plaintiff met the listing for 12.04 (Affective Disorders)

and referred the ALJ to Dr. Stern's opinions regarding Plaintiff's mental impairments.  (*See id*.

at 42.)

Plaintiff testified that he was born on September 22, 1963 and had completed schooling

through the 10th grade.  (*Id*. at 51.)  He testified that he had previously worked in construction,

specializing in carpentry, but that he was laid off in 2009.[31]  (*Id.* at 46, 51.)  Plaintiff reported

that part of the reason he lost his job was his excessive drinking.  (*Id*. at 46, 52.)  When the ALJ

asked Plaintiff how much he was drinking at that time, Plaintiff estimated four to five pints of

vodka a day.  (*Id*. at 46.)  Plaintiff also testified that he had previously used about a bag of

powder cocaine a day, with friends.  (*Id.* at 62-63.)  Plaintiff testified that, after his most recent

hospitalization (which was at Bellevue, following a suicide attempt), he had stopped using drugs

---

[31] Plaintiff testified that, for about two months in the spring of 2010, he had painted and plastered offices and received payment "off the books."  (*Id*. at 43-45.)

and alcohol and had not used since that time.  (*Id.* at 46-47, 62.)  Plaintiff also described other

suicide attempts to the ALJ and reported that he would often "flip" and become sad when he saw

a happy family because all of his family members had died.  (*Id.* at 57-58.)  After Plaintiff

described his suicide attempts and alcohol use, the ALJ requested more information from

Plaintiff's attorney concerning whether Plaintiff's alcohol consumption was material to his

psychiatric condition.  (*Id.* at 49.)

      Plaintiff also testified regarding his diabetes, high cholesterol, high blood pressure, foot

pain, back and arm pain, and throat cancer.  (*Id.* at 53-54; 56-58.)  Plaintiff reported that he spent

his days either walking around in the park or staying home and watching television.  (*Id.* at 55.)

He testified that he could not "stay still" and, instead, had to walk and then sit down, but that he

could not stand up or sit down for long.  (*Id.* at 55-56.)  Plaintiff testified that, due to the pain in

his back, he could not bend, could only walk about a block and a half before he had to sit, could

sit for only 10 to 15 minutes, and could stand for only 10 minutes.  (*Id.* at 56.)  Plaintiff stated

that he was taking medicine, but, except for Geodon, he had trouble remembering the names of

his medications.  (*See id.* at 60-61.)  He testified that, at the time of the hearing, he was living

with his girlfriend.  (*Id.* at 50.)

      In a decision dated March 2, 2012, the ALJ found Plaintiff not disabled.  (*Id.* at 21-38.)

The ALJ's decision is discussed in detail below.  (See *infra* at Discussion Section II.)

### 3.      Plaintiff's Request for Review by the Appeals Council

      On April 6, 2012, Plaintiff requested that the Appeals Council review the ALJ's decision.

(R. at 18-20.)  The ALJ's decision became final after the Appeals Council denied Plaintiff's

request for review on August 9, 2013.  (*Id.* at 1-7.)

4.      **The Motions Before This Court**

On September 26, 2013, Plaintiff filed a Complaint in this Court, contending that "the decision of the [ALJ] affirmed by the Appeals Council was erroneous and unfounded[,]" was "not supported by substantial evidence,"  and was "contrary to the law and its provisions as found in the Social Security Act."  (Complaint, filed Sept. 26, 2013 (Dkt. 1), ¶¶ 13, 14.) Defendant filed an answer on April 23, 2014.  (Dkt. 13.)

On May 22, 2014, Plaintiff moved for judgment on the pleadings (Dkt. 15), and submitted a memorandum of law in support of his motion (Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings, dated May 22, 2014 ("Pl. Mem.") (Dkt. 16). In his motion, Plaintiff only challenges the ALJ's findings as they relate to his alleged mental impairments.  (*See* Pl. Mem., at 1 n.3.)

On June 23, 2014, Defendant filed a cross-motion (Dkt. 19) and supporting memorandum (Memorandum of Law in Support of Defendant's Cross-Motion for Judgment on the Pleadings, dated June 23, 2014 ("Def. Mem.") (Dkt. 20)), seeking judgment affirming the final decision of the Commissioner.

## DISCUSSION

I.      **APPLICABLE LEGAL STANDARDS**

A.      **Standard of Review**

Judgment on the pleadings under Rule 12(c) is appropriate where "the movant establishes 'that no material issue of fact remains to be resolved,'" *Guzman v. Astrue*, No. 09cv3928 (PKC), 2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (quoting *Juster Assocs. v. City of Rutland*, 901 F.2d 266, 269 (2d Cir. 1990)), and a judgment on the merits can be made "'merely by

considering the contents of the pleadings.'"  *Id.* (quoting *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)).

Judicial review of a decision of the Commissioner is limited.  The Commissioner's decision is final, provided that the correct legal standards are applied and findings of fact are supported by substantial evidence.  42 U.S.C. § 405(g) (2006); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (citations omitted).  "Where an error of law has been made that might have affected the disposition of the case, [a] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ."  *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (citation omitted).  Thus, the first step is to ensure that the Commissioner applied the correct legal standards.  *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The next step is to determine whether the Commissioner's decision is supported by substantial evidence.  *See Tejada*, 167 F.3d at 773.  Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted).  In making this determination, a court must consider the underlying record.  The reviewing court does not, however, decide *de novo* whether a claimant is disabled.  *See Veino v. Barnhart,* 312 F.3d 578, 586 (2d Cir. 2002) ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner."); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997).  Therefore, if the correct legal principles have been applied, this Court must uphold the Commissioner's decision upon a finding of substantial

evidence, even where contrary evidence exists.  *See Alston v. Sullivan*, 904 F.2d 122, 126

(2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination

is one to be made by the factfinder."); *see also DeChirico v. Callahan*, 134 F.3d 1177, 1182-83

(2d Cir. 1998) (affirming decision where substantial evidence supported both sides).

### B.    The Five-Step Sequential Evaluation

To be entitled to disability benefits under the Act, a claimant must establish his or her

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months."  42 U.S.C.

§§ 423(d)(1)(A), 1382c(3)(A); *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  An individual

is considered to be under a disability only if the individual's physical or mental impairments are

of such severity that he or she is not only unable to do his or her previous work, but also cannot,

considering his or her age, education, and work experience, engage in any other kind of

substantial gainful work that exists in the national economy.  42 U.S.C. §§ 423(d)(2)(A),

1382c(C)(i).

In evaluating a disability claim, an ALJ must follow the five-step procedure set out in

the regulations governing the administration of Social Security benefits.  *See* 20 C.F.R.

§§ 404.1520; *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam).  Throughout

the inquiry, the ALJ must consider four primary sources of evidence:  "(1) the objective medical

facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or

disability testified to by the claimant or others; and (4) the claimant's educational background,

age, and work experience."  *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (citations omitted).

The first step of the inquiry requires the ALJ to determine whether the claimant is engaged in substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i).  If not, at the second step, the ALJ determines whether the claimant has a "severe" impairment or combination of impairments that significantly limits his or her physical or mental ability to do basic work activities.  *Id.* §§ 404.1520(a)(4)(ii), (c).  If the claimant does suffer from such an impairment, then the third step requires the ALJ to determine whether this impairment meets or equals an impairment listed 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings").  *Id.* § 404.1520(a)(4)(iii).  If it does, then the claimant is presumed to be disabled "without considering [the claimant's] age, education, and work experience."  *Id.*

Where the plaintiff claims mental impairment, steps two and three require the ALJ to apply a "special technique," outlined in 20 C.F.R. § 404.1520a(b) to determine the severity of the claimant's impairment at step two, and to determine whether the impairment satisfies Social Security regulations at step three.  *See Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008).  If the claimant is found to have a "medically determinable mental impairment," the ALJ is required to "specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s)" and then to "rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (e) of [section 404.1520a]," which specifies four broad functional areas:  (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation."[32]  20 C.F.R. §§ 404.1520a(b)(1)-(2),

---

[32] "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  *Morales v. Colvin*, No. 13cv4302 (SAS), 2014 WL 7336893, at *8 (S.D.N.Y. Dec. 24, 2014) (quoting *Kohler v. Astrue*, 546 F.3d 260, 266 n.5 (2d Cir. 2008)).

(c)(3); *see Kohler*, 546 F.3d at 265.  The functional limitations for these first three areas are rated on a five-point scale of "[n]one, mild, moderate, marked, [or] extreme," and the limitation in the fourth area (episodes of decompensation) is rated on a four-point scale of "[n]one," "one or two," "three," or "four or more."  20 C.F.R. § 404.1520a(c)(4).

If the claimant's impairment does not meet or equal a listed impairment, then the ALJ must determine, based on all the relevant evidence in the record, the claimant's residual functional capacity ("RFC"), or ability to perform physical and mental work activities on a sustained basis.  *Id.* § 404.1545.  The ALJ then proceeds to the fourth step of the inquiry, which requires the ALJ to determine whether the claimant's RFC allows the claimant to perform his or her "past relevant work."  *Id.* § 404.1520(a)(4)(iv).  Finally, if the claimant is unable to perform his or her past relevant work, the fifth step requires the ALJ to determine whether, in light the claimant's RFC, age, education, and work experience, the claimant is capable of performing "any other work" that exists in the national economy.  *Id.* §§ 404.1520(a)(4)(v), (g).

On the first four steps of the five-step evaluation, the claimant generally bears the burden of establishing facts to support his or her claim.  *See Berry*, 675 F.2d at 467 (internal citation omitted).  At the fifth step, the burden shifts to the Commissioner to "show that there is work in the national economy that the claimant can do."  *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *see also Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).  The Commissioner must establish that the alternative work "exists in significant numbers" in the national economy and that the claimant can perform this work, given his or her RFC and vocational factors.  20 C.F.R. § 404.1560(c)(2).  Where the claimant only suffers from exertional impairments, the Commissioner can satisfy this burden by referring to the Medical-Vocational Guidelines, set out in 20 C.F.R. Pt. 404, Subpt. P, App. 2 (the "Guidelines").  Where, however, the claimant suffers

36

non-exertional impairments, such as visual impairment, psychiatric impairment, or pain, *see* 20 C.F.R. § 404.1569(a), that "'significantly limit the range of work permitted by his [or her] exertional limitations,' the ALJ is required to consult with a vocational expert," rather than rely exclusively on these published guidelines.  *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Bapp v. Bowen*, 802 F.2d 601, 604-05 (2d Cir. 1986) (internal citations omitted)).

### C.   Drug or Alcohol Abuse

"When there is medical evidence of an applicant's drug or alcohol abuse, the 'disability' inquiry does not end with the five-step analysis."  *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012) (citing 20 C.F.R. § 416.935(a)), *cert. denied*, 133 S. Ct. 2881 (2013). Pursuant to the Act, "an individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled."  42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J); *see also* 20 C.F.R. § 404.1535(a).  Accordingly, where an ALJ finds that a claimant is disabled under the sequential analysis and the medical evidence demonstrates that the claimant suffers from drug or alcohol addiction, the ALJ must determine whether the Plaintiff would still be "disabled" if he stopped using drugs or alcohol.  *See* 20 C.F.R. § 404.1535(b)(1).  Should the ALJ determine that the physical and mental limitations that would remain after the cessation of drug or alcohol use would not be disabling, then the ALJ should conclude that addiction is a contributing factor material to a determination of disability, and that the claimant is not entitled to disability benefits.  *Id*. § 404.1535(b)(2).

It is clear from the language of Section 404.1535 that "the ALJ must first make a determination as to disability by following the five-step sequential evaluation process, 'without segregating out any effects that might be due to substance use disorders.'"  *Piccini v. Comm'r of*

37

*Soc. Sec.*, No. 13cv3461 (AJN) (SN), 2014 WL 4651911, at *12 (S.D.N.Y. Sept. 17, 2014),

*adopting report and recommendation* (citing *Brueggmann v. Barnhart*, 348 F.3d 689, 694

(8th Cir. 2003)); *see also Day v. Astrue*, No. 07cv157 (RJD), 2008 WL 63285,at *5-6 (E.D.N.Y.

Jan. 3, 2008); *Webb v. Colvin*, No. 12cv753S, 2013 WL 5347563, at *5 (W.D.N.Y. Sept. 23,

2013); *Kinner v. Comm'r of Soc. Sec.*, No. 08cv1240, 2010 WL 653703, at *3-4  (N.D.N.Y.

Feb. 19, 2010).  Therefore, an ALJ's initial disability determination should "concern[] strictly

symptoms, not causes."  *Newsome v. Astrue*, 817 F. Supp. 2d 111, 134 (E.D.N.Y. 2011) (citing

*Brueggemann,* 348 F.3d at 694)).  Only after the claimant has been determined to be disabled

should the ALJ consider whether the claimant would remain disabled if he stopped abusing drugs

and alcohol.  *See Piccini*, 2014 WL 4651911, at *12 (citing *Cordero v. Astrue*, 574 F. Supp. 2d

373, 377 (S.D.N.Y. 2008)).

### D.   <u>Consideration of Medical Opinions</u>

The medical opinion of a treating source[33] as to "the nature and severity of [the

claimant's] impairments" is entitled to "controlling weight," where the opinion is "well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).

Treating physicians' opinions are generally accorded deference because treating physicians "are

likely to be the medical professionals most able to provide a detailed, longitudinal picture" of a

claimant's condition and "bring a unique perspective to the medical evidence that cannot be

---

[33] "[T]reating source" is defined as the claimant's "own physician, psychologist, or other acceptable medical source who . . . has provided [the claimant] with medical treatment or evaluation" and who has had "an ongoing treatment relationship" with him or her.  20 C.F.R. §§ 404.1502, 416.902.  A medical source who has treated or evaluated the claimant "only a few times" may be considered a treating source "if the nature and frequency of the treatment or evaluation is typical for [the claimant's] condition(s)."  *Id*.

obtained from the objective medical findings alone or from reports of individual examinations,

such as consultative examinations."  20 C.F.R. § 404.1527(c)(2); *see Taylor v. Barnhart*,

117 F. App'x 139, 140 (2d Cir. 2004).

Where the ALJ decides to give less than controlling weight to a treating physician's

opinion, and also in determining the weight to be accorded to the medical opinion of a non-

treating physician, the ALJ is required to consider a number of factors.  These include:  (1) the

length, nature, and extent of the relationship between the claimant and the physician; (2) the

supportability of the physician's opinion; (3) the consistency of the physician's opinion with the

record as a whole; and (4) the specialization of the physician providing the opinion.  20 C.F.R.

§§ 404.1527(c)(2)-(5); *see also Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (noting that

these factors "must be considered when the treating physician's opinion is not given controlling

weight").

An ALJ must "give good reasons" for the weight accorded to a treating source's opinion.

20 C.F.R. §§ 404.1527(c)(2).  Failure to "give good reasons" is grounds for remand.  *Halloran v.

Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the

Commissioner has not provided 'good reasons' for the weight given to a treating physician's

opinion . . . .").  In addition, a consultative physician's opinions should generally be given "little

weight."  *Giddings v. Astrue*, 333 F. App'x 649, 652 (2d Cir. 2009) (internal quotation marks and

citation omitted).  This is because consultative examinations "are often brief, are generally

performed without benefit or review of [the] claimant's medical history, and, at best, only give a

glimpse of the claimant on a single day."  *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990)

(internal quotation and citation omitted).)

II.   **THE ALJ'S DECISION**

In his March 2, 2012 decision, the ALJ found that Plaintiff was not disabled under the Act and thus denied Plaintiff's request for SSD benefits.  (*See generally* R. at 21-33.)  In his decision, the ALJ applied the five-step sequential evaluation procedure set out in the Commissioner's regulations.[34]  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset of his disability on March 1, 2009.  (*Id*. at 26.)  At step two, the ALJ found that Plaintiff's diabetes and depression constituted severe impairments that caused "more than minimal functional limitations."  (*Id*. at 27.)  The ALJ, however, rejected Plaintiff's claims that his alleged hypertension, lower back pain, right arm pain, and throat cancer constituted severe impairments.  (*Id*.)  The ALJ cited records provided by treating physician Dr. Stahl and consultative examiner Dr. Lathan in support of this conclusion. (*Id*.)

At step three, the ALJ found that Plaintiff's impairments did not meet, or medically equal, the severity of one of the listed impairments contained in the applicable listings (the "Listings"), focusing specifically on Listings 12.04 (affective disorders) and 12.09 (substance addiction disorders).  (*Id*. at 27.)  The ALJ concluded that Plaintiff had mild restrictions in activities of daily living, moderate difficulties in social functioning, and moderate difficulties in concentration, persistence, and pace.  (*Id*.)  As Plaintiff's mental impairments did not result in at least two "marked" limitations, or in one "marked" limitation and "repeated" episodes of decompensation, the ALJ found that the requirements to satisfy step three had not been met.  (*Id*. at 28.)

---

[34] Before engaging in the five-step sequential evaluation, the ALJ determined that Plaintiff satisfied the insured status requirement of the Act through March 31, 2013.  (*Id*. at 26.)

The ALJ thus proceeded to conduct an RFC assessment before moving on to step four of the evaluation. (*Id.*) After examining the record, the ALJ concluded that Plaintiff had the RFC to perform the full range of unskilled, sedentary work as defined in 20 C.F.R. § 404.1567(a). (*Id.*) He stated that he based his finding on a two-step process, whereby he examined (1) whether there existed an underlying medically determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's symptoms and (2) the intensity, persistence, and limiting effects of Plaintiff's symptoms and the extent to which they limited Plaintiff's functioning. (*Id.*) The ALJ found that, while Plaintiff's "medically determinable impairments could reasonably be expected to cause [his] alleged symptoms," Plaintiffs "statements concerning the intensity, persistence or limiting effects of the[ ] symptoms [were] not credible to the extent they [were] inconsistent with [the ALJ's] [RFC] assessment."[35] (*Id.* at 29.)

The ALJ concluded that, despite Plaintiff's physical impairments, Plaintiff was capable of performing exertionally sedentary work. (*Id.*) As to the only physical impairment that the ALJ determined was severe, diabetes, the ALJ noted that, while Plaintiff "[had] significant peripheral neuropathy in the extremities," treating physician Dr. Stahl had concluded in his September 2010 assessment that Plaintiff "was able to lift up to twenty pounds occasionally and up to ten pounds frequently, sit unlimited, and stand and walk for up to six hours each during the course of the workday." (*Id.*) The ALJ also cited to Dr. Stahl's July 2011 finding that, even though Plaintiff had "decreased sensation in his feet, . . [he] would be able to work with

---

[35] Several recent decisions have identified identical language in ALJ decisions as, *inter alia*, "boilerplate" or "template-driven." *See Molina v. Colvin*, No. 13cv4989 (AJP), 2014 WL 3445335, at *14 n.19 (S.D.N.Y. July 14, 2014) (collecting cases in which similar language has been used by ALJs); *Cahill v. Colvin*, No. 12cv9445 (PAE) (MHD), 2014 WL 7392895, at *23 (S.D.N.Y. 2014) (characterizing identical language as "meaningless boilerplate").

restrictions." (*Id*.)  The ALJ also considered the assessment of consultative physician

Dr. Lathan, citing to Dr. Lathan's specific findings and to his conclusion that Plaintiff had only a

"moderate restriction for prolonged standing and walking." (*Id*.)

The ALJ concluded that "the record evidence also support[ed] the finding that [Plaintiff]

retain[ed] the ability to perform all basic mental work activities" (*id*.), which he defined as

"understanding and remembering simple instructions, using judgment, responding appropriately

to supervision, co-workers and usual work situations, and dealing with changes in a routine work

setting" (*id*. at 29-30 (citing 20 C.F.R. § 404.1521)).  Before reaching this conclusion, the ALJ

first recited consultative psychologist Dr. Bougakov's findings that Plaintiff "was able to follow

and understand simple directions and instructions, perform simple tasks, maintain attention and

concentration, make appropriate decisions, relate adequately with others, and deal with stress."

(*Id*. at 30.)  The ALJ also noted Dr. Bougakov's findings that Plaintiff's "cognitive symptoms

were mild, and that [Plaintiff's] psychiatric difficulties did not appear to be significant enough to

interfere with his ability to function on a daily basis." (*Id*.)

The ALJ then went into a detailed discussion of Plaintiff's "significant history of

substance abuse," citing many portions of the evidentiary record. (*Id*. at 30-31.)  He noted that

all of Plaintiff's suicide attempts were "subsequent to using and abusing substances" and that

Plaintiff had "repeatedly been diagnosed with substance induced mood disorder, cocaine

dependence, ETOH dependence, and intoxication." (*Id*. at 30.)  The ALJ cited to numerous

statements by the Plaintiff's girlfriend suggesting that Plaintiff's suicidal and combative behavior

only occurred "when he [was] drunk," as well as statements from Plaintiff that his depression

was exacerbated by alcohol. (*Id*.)  The ALJ pointed to treatment documentation from Plaintiff's

September 2011 admission to Bellevue that showed that Plaintiff was "cooperative and well

42

related, with goal directed and logical thought process, normal thought content, no aggressive ideation, a normal and stable affect, and intact impulse control when not abusing substances." (*Id.*)  He also stated that, "[e]ven while under the influence of substances, [Plaintiff] [had] presented with a constricted affect, impaired impulse control, and impaired insight and judgment, but also as well related and cooperative, with normal eye contact, fluent but pressured speech, intact attention and concentration, and goal directed and logical thought processes."  (*Id.* at 31.)

The ALJ then went on to describe the findings of Plaintiff's treating psychiatrist, Dr. Stern, placing particular emphasis on Dr. Stern's finding that Plaintiff was diagnosed with "continuous and excessive alcohol abuse [and] polysubstance dependency," in addition to depression.  (*Id.*)  He recited Dr. Stern's assessments of Plaintiff's limitations, including Dr. Stern's opinion that Plaintiff had "marked limitations in his ability to maintain attention and concentration for extended periods, perform activities within a schedule, sustain an ordinary routine without special supervision, work in coordination with or proximity to others, perform at a consistent pace, and interact appropriately with supervisors, co-workers and the public."  (*Id.*) He then noted, though, that Dr. Stern's finding of marked limitations was in an "assessment dated August 10, 2011, while [Plaintiff] was still abusing substances," and that "[Plaintiff] reported that he stopped using after his admission to Bellevue Hospital in September 2011." (*Id.*)

The ALJ again stated that all of Plaintiff's suicide attempts and hospital admissions "occurred subsequent to abuse of drugs and alcohol" and, therefore, found that Dr. Stern's "opinion that [Plaintiff's] substance abuse [was] not material to his mental illness" was "completely contrary to the evidence."  (*Id.*)  He further stated that the treatment notes of the examining sources and the statements of Plaintiff and his girlfriend supported this finding.

Moreover, the ALJ again noted that Dr. Stern's assessment of Plaintiff's limitations "occurred in August 2011, while [Plaintiff] was still abusing substances." (*Id*.)

The ALJ concluded that Plaintiff's allegations regarding the symptoms of his impairments were not "entirely consistent with objective medical evidence." (*Id*.) He stated that, although Plaintiff experienced "symptoms of physical and mental impairments, he ha[d] not shown a restriction on his activities of daily living which correspond[ed] to the alleged severity of his impairments." (*Id*.) Specifically, the ALJ found that Plaintiff's "admitted activities of daily living contradict[ed] his allegation of disability." (*Id*.)

The ALJ stated that he had considered all of the opinions present in the record in making his RFC determination. (*Id*. at 32.) He stated that he gave "[s]ignificant weight" to the findings of the consultative examiners, Dr. Bougakov and Dr. Lathan. (*Id*.) He stated that he gave weight to the mental status assessment completed by state psychological consultant, Dr. Harding, "to the extent it [was] consistent with the medical evidence of record and the opinion of Dr. Bougakov." (*Id*.) As to treating physician, Dr. Stahl, the ALJ stated that he accorded "significant weight" to his opinion, "as it is consistent with the medical evidence of record." (*Id*.) As to Plaintiff's treating psychiatrist, however, the ALJ stated that

> the opinion of Dr. Stern . . . regarding [Plaintiff's] mental limitations and the non-materiality of substance abuse is not accorded much weight, as it is completely contrary to the medical evidence of record, including diagnoses of substance induced mood disorder, the statements of [Plaintiff] and his girlfriend regarding his behavior while drinking, and [Plaintiff's] activities of daily living.

(*Id*.) The ALJ also noted that determination of disability was not a medical issue, as it was, instead, reserved to the Commissioner; thus, the ALJ found that Dr. Stern's opinion that Plaintiff

was unable to work for 12 months did not have to be given "controlling or significant weight." (*Id.*)

After performing the RFC assessment, the ALJ proceeded to step four of the evaluation and concluded that Plaintiff could not perform his past relevant work as a painter because the medium exertional level required to carry out such work exceeded Plaintiff's RFC.  (*Id.*)  Finally, the ALJ moved on to step five of the sequential evaluation.  There, the ALJ concluded that, considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.  (*Id.*)  In making this determination, the ALJ followed the Guidelines (specifically, Rule 201.18, 20 C.F.R. Pt. 404, Subpt. P, App. 2) which dictated the conclusion that Plaintiff was not disabled.  (*Id.* at 33.)

## III.   **REVIEW OF THE ALJ'S DECISION**

Plaintiff argues that the ALJ did not properly evaluate the psychiatric medical evidence in this case.  (Pl. Mem. at 13.)  Specifically, Plaintiff contends that the ALJ did not afford enough weight to treating psychiatrist Dr. Stern's opinion that Plaintiff's substance abuse was merely a symptom of his mental impairments and was not a material contributing factor to those impairments.  (*Id.* at 14-15.)  There appears to be two related arguments here:  (1) that the ALJ did not properly apply 20 C.F.R. § 404.1535 as to Plaintiff's drug and alcohol abuse, and (2) that the ALJ did not properly apply the treating physician rule.

In response, Defendant argues that "the ALJ properly did not go through the full process for determining the materiality of Plaintiff's substance abuse because the ALJ did not first find that Plaintiff was disabled according to the sequential analysis."  (Def. Mem., at 26.)  Instead, the ALJ "properly reviewed the full record and, in going through the full five-step sequential evaluation, reasonably found that plaintiff was not disabled even considering his substance

abuse." (*Id.*) While this explanation describes an analysis that would follow Section 404.1535, it is not clear from the ALJ's decision that he actually went through the full five-step sequential evaluation first with an eye "strictly [on the] symptoms, not [the] causes" *see Newsome*, 817 F. Supp. 2d at 134, and thereby found that Plaintiff was not disabled.

In fact, in the section discussing the analysis for his RFC determination, the ALJ discussed the Plaintiff's history of drug and alcohol abuse and its effects on his symptoms in detail, and appeared to focus on the ways in which the substance abuse caused or exacerbated Plaintiff's symptoms. (R. at 30-31.) For example, the ALJ noted (with all bold-faced phrases shown here emphasized, in bold, by the ALJ himself) that "[t]reatment notes indicate that [Plaintiff's] alcohol abuse 'ha[d] **exacerbated suicidality**" and that, according to Plaintiff's girlfriend, Plaintiff became "**combative with strangers when he dr[ank]**" and "**only bec[ame] suicidal when he [was] drunk.**" (*Id.* at 30.) The ALJ also referred to Plaintiff's own statements that he was "**sick of hurting [him]self while [he was] drunk**" and that, immediately preceding a suicide attempt, Plaintiff "**started to feel more and more depressed after having used cocaine and alcohol**." (*Id.*) These comments of the ALJ suggest that, in connection with making his initial RFC assessment, he examined the reasons behind Plaintiff's symptoms, and then discounted the symptoms where he found that they were caused by alcohol and drug abuse – an approach that is improper under the regulations. *See e.g., Webb*, 2013 WL 5347563, at *6 (remanding where "[t]he ALJ's decision [was] unclear as to whether he determined that [p]laintiff was not disabled after consideration of [all plaintiff's] symptoms, or if symptoms resulting from [p]laintiff's substance abuse were discounted prior to this determination"); *Newsome*, 817 F. Supp. 2d at 134 (ALJ did not follow the proper procedure where he made an RFC assessment "without taking into account any disabling symptoms causing physical

limitations that he determined were attributable to the [p]laintiff's alcohol abuse").  Similarly, as to step three, after finding that Plaintiff "experienced three episodes of decompensation, each of extended duration," the ALJ noted that each of the episodes occurred "after a suicide attempt [by Plaintiff] subsequent to drinking and drug use."  (R. at 28.)  These statements "indicate that the ALJ may have improperly minimized or excluded symptoms because they may have been caused by substance abuse."[36]  *See Piccini*, 2014 WL 4651911, at *15.

It also appears that the ALJ's initial, improper focus on substance abuse as a "cause" of Plaintiff's symptoms may have led the ALJ to have assigned inappropriately reduced weight to the opinions of Plaintiff's treating psychiatrist, Dr. Stern, regarding the nature and severity of Plaintiff's mental impairments.  The ALJ stated that he was not according "much weight" to Dr. Stern's opinions regarding Plaintiff's mental limitations because, according to the ALJ, such opinions were "completely contrary to the medical evidence of record."  (R. at 32.)  Although inconsistency with the medical record can be a proper basis for choosing to give less than controlling weight to a treating physician's opinion, the Record in this case does not actually reflect that Dr. Stern's opinions regarding Plaintiff's mental impairments were at odds with the underlying medical evidence.  After citing to Dr. Stern's opinions that Plaintiff had "marked limitations" in a number of categories,[37] the ALJ merely noted that Dr. Stern's assessment "was

---

[36] This Court notes that the ALJ did refer to one record from a hospital admission where Plaintiff was reported to be "under the influence of substances" and impaired in impulse control, insight and judgment, but also "related and cooperative, with normal eye contact, fluent but pressured speech, intact attention and concentration, and goal directed and logical thought process."  (R. at 31.)  While the ALJ might have concluded, from this particular hospital record, that the symptoms exhibited by Plaintiff at that time (even while "under the influence") were not sufficiently significant to be disabling, this was just one reference amid several paragraphs of analysis that appeared to minimize Plaintiff's symptoms because of their relation to his substance abuse.

[37] Dr. Stern reported that Plaintiff had "marked limitations" in his ability to:  maintain attention and concentration for extended periods, perform activities within a schedule, sustain an

dated August 10, 2011, while the claimant was still abusing substances" and that "claimant reported that he stopped using after his admission to Bellevue Hospital in September 2011." (R. at 31.)  This is insufficient to demonstrate that the Dr. Stern's opinions were in conflict with the medical tests and psychiatric evaluations that had been performed during the course of Plaintiff's treatment, and the ALJ did not point to medical evidence showing that any tests or evaluations of Plaintiff's mental ability to perform work-related activities had changed significantly after September 2011.[38]  Moreover, while substance abuse is ultimately "relevant in determining whether a claimant is disabled under the regulations . . . it bears no relevance to the weight that must be given to the opinion of a treating physician."  *Vernon v. Astrue*, No. 06cv13132 (RMB) (DF), 2008 WL 5170392, at *20 (S.D.N.Y. Dec. 9, 2008), *adopting report and recommendation*.

Even if the ALJ had a proper basis for determining that Dr. Stern's opinions were inconsistent with the medical evidence in the Record, and were therefore not entitled to

---

ordinary routine without special supervision, work in coordination with or proximity to others, perform at a consistent pace, and interact appropriately with supervisors, co-workers and the public.  (R. at 31.)

[38] If there *had* been a basis for finding that any opinion of Plaintiff's treating physician opinion was inconsistent with the medical record for the relevant period, then the ALJ would have had an affirmative duty to develop the administrative record so as to clarify the basis for the opinion.  *See Ocasio v. Barnhart*, No. 00cv6277 (SJ), 2002 WL 485691, at *8 (E.D.N.Y. Mar. 28, 2002) ("If the reports of treating physicians are insufficient or inconsistent, the ALJ may not simply dismiss them.  Rather, he has an affirmative duty to develop the administrative record, including seeking additional information from the treating physicians." (citing *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (additional citations omitted))); *accord* Social Security Ruling 96-5p (S.S.A. July 2, 1996) ("Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion.").  The ALJ, however, did not seek any additional information from Dr. Stern in this case.

controlling weight, the ALJ was still required to apply the factors listed in 20 C.F.R.

§§ 404.1527(c) to determine the weight to accord to this treating source's opinions.  *See* Social

Security Ruling 96-2P (S.S.A. July 2, 1996) (stating that a finding of inconsistency "means only

that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected,"

and that the opinion "is still entitled to deference and must be weighed using all of the factors" in

the applicable regulations).  These factors include not only consistency, but also the length of the

doctor's treating relationship with the claimant, the nature and extent of the relationship, the

supportability of the doctor's opinion, and the nature of the doctor's specialization.  20 C.F.R.

§§ 404.1527(c).  Here, the ALJ's decision does not reflect that he evaluated these factors.

    The ALJ also found that "Dr. Stern's opinion that [Plaintiff's] substance abuse [was] not

material to his mental illness" was "completely contrary to the evidence" and stated that he was

therefore not according this opinion on "materiality" much weight.  (R. at 31-32.)  Yet, as

discussed above, the ALJ should not even have been considering the materiality of Plaintiff's

drug and alcohol abuse to his mental impairments during the initial, five-step evaluation.  *See*

*Piccini*, 2014 WL 4651911, at *15 (noting that "whether alcoholism or drug addiction is a

contributing factor to disability may be considered only *after* the initial disability determination

is made" (emphasis in original)); *accord* Social Security Ruling 13-2p (S.S.A. Mar. 22, 2013)

("SSR 13-2p") (directing ALJs to "apply the steps of the sequential evaluation a second time to

determine whether the claimant would be disabled if he or she were not using drugs or

alcohol").[39]  Instead, as previously described, the ALJ should have first performed the evaluation

regarding Plaintiff's symptoms and related impairments, and if, as a result of those impairments,

---

[39] SSR 13-2p provides a detailed description of the proper method for evaluating cases
involving drug addiction and alcoholism.  While this administrative ruling was released after the
ALJ's decision regarding Plaintiff, the underlying regulations on which it is based are the same.

he found that Plaintiff was disabled, then he should have proceeded to perform the evaluation a second time to determine if Plaintiff's substance abuse was a contributing factor to the disability.

It may well be that, upon a proper evaluation, the ALJ reaches the same ultimate conclusion as he reached here – *i.e.*, that Plaintiff is not disabled – because, even if Plaintiff's impairments are found to be disabling, his substance abuse may still be found to be a material contributing factor to those impairments.  Nonetheless, the Court should not speculate as to the result the ALJ would reach upon following the correct evaluative procedures.  Nor should the Court substitute its judgment for the ALJ's as to the proper weight to be assigned to the opinions of Plaintiff's treating psychiatrist, absent an initial consideration by the ALJ of the factors relevant to that determination.  *See Piccini*, 2014 WL 4651911, at *16 (stating that "[t]he Court is mindful that, when the proper legal analysis is followed, the ALJ may conclude that substantial evidence supports a finding of no disability.  But to assume that conclusion creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." (internal quotation marks and citations omitted)).

Given that the ALJ apparently erred in his application of both Section 404.1535 and the treating physician rule, and that it is not entirely clear that the ALJ would have made reached the same conclusion had he adhered to the regulations, I recommend that this case be remanded "so that the ALJ can separately determine [Plaintiff's] disability before assessing whether or not [his] [substance] abuse constitutes a contributing factor material to that determination," *Piccini*,

50

2014 WL 4651911, at *15, and so the ALJ can properly evaluate the opinions of Plaintiff's

treating psychiatrist, Dr. Stern.[40]

## **CONCLUSION**

For all of the foregoing reasons, I respectfully recommend granting Plaintiff's motion for

judgment on the pleadings (Dkt. 15), to the extent that her claim be remanded for further

consideration of whether Plaintiff is disabled due to his mental impairments.  I recommend that

Defendant's cross-motion (Dkt. 19) be denied.

I further recommend that, upon remand, the ALJ be specifically directed, in the first

instance, to utilize the five-step sequential evaluation to determine whether Plaintiff's mental

impairments are sufficient to render him disabled, and, if so, to turn *then* to the question of

whether Plaintiff's substance abuse constitutes a contributing factor material to that

determination.   Also, in connection with evaluating Plaintiff's level of functioning in each of the

domains relevant to Listings 12.04 and 12.09, and in evaluating Plaintiff's RFC, the ALJ should

be directed to reconsider the evidence in the Record regarding Plaintiff's mental impairments in

accordance with 20 C.F.R. § 404.1527(c), regarding the weighing of medical opinion evidence,

and to develop the Record as necessary to fill in any gaps or to clarify medical findings.

This Court also notes that Plaintiff has raised certain additional arguments here –

specifically regarding the ALJ's assessment of Plaintiff's credibility and reliance on the Medical-

Vocational Guidelines (*see* Pl. Mem., at 20, 23) – that the need Court not reach at this juncture,

given that the ALJ's analysis may change on these points upon remand.  Nonetheless, I

---

[40] I do not recommend that Plaintiff's claim be remanded for further consideration of his
physical impairments, as Plaintiff's motion before this Court focused solely on the ALJ's
decision with respect to his mental impairments, raising no objection to the ALJ's findings
regarding his physical impairments.

recommend that, on remand, the ALJ be reminded (a) to apply Social Security Ruling 96-7p, in evaluating Plaintiff's credibility (*see* SSR 13-2p (noting that "[a]djudicators must not presume that all claimants with [drug and alcohol abuse] are inherently less credible than other claimants . . . and [should] apply [the regular] policy in SSR 96-7p")), and (b) to consult with a vocational expert, rather than rely solely on the Guidelines, should he find that Plaintiff suffers from psychiatric impairments that "significantly limit the range of work permitted by his exertional limitations," *Zabal,* 595 F.3d at 410 (internal quotation marks and citation omitted); *see also* 20 C.F.R. § 404.1569a.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  *See also* Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Lorna G. Schofield, United States Courthouse, 40 Foley Square, Room 201, New York, NY 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, NY 10007.  Any requests for an extension of time for filing objections should be directed to Judge Schofield.  FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.  *See Thomas v. Arn,* 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*,

968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988);

*McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:  New York, New York
        February 10, 2015

                                        Respectfully submitted,


                                        DEBRA FREEMAN
                                        United States Magistrate Judge

Copies to:

Hon. Lorna G. Schofield, U.S.D.J.

All counsel (via ECF)